IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

CHARLES NOEL EDGAR,

     Plaintiff,

v.                                CASE NO. 1:17-cv-146-MW-GRJ

NANCY A. BERRYHILL,
Acting Commissioner of Social Security,

     Defendant.

_____/

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff appeals to this Court from a final decision of the Acting Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act ("the Act"). (ECF No. 1.) The Commissioner has answered, (ECF No. 8), and both parties have filed briefs outlining their respective positions. (ECF Nos. 15, 19.) For the reasons discussed below, it is recommended that the Commissioner's decision should be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff protectively filed his application for Title XVI benefits on February 27, 2014, alleging a disability onset date of January 1, 2010, due

to chronic obstructive pulmonary disease ("COPD"), emphysema, hip problems, back injury, shoulder injury, migraines, acid reflux, and colon issues. (R. 142–49, 167–76.) His application was denied initially and upon reconsideration. (R. 81–83, 93–97.) Following a hearing on March 15, 2016, an Administrative Law Judge ("ALJ") issued a written decision on May 16, 2016, finding Plaintiff not disabled. (R. 18–32.) The Appeals Council thereafter denied Plaintiff's request for review. (R. 1–4.) Plaintiff subsequently appealed the ALJ's decision to this Court. (ECF No. 1.)

## II.  STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g) (2012). Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *accord Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial

evidence, the district court will affirm, even if the reviewer would have

reached a contrary result as finder of fact, and even if the reviewer finds

that the evidence preponderates against the Commissioner's decision.

*Edwards*, 937 F.2d at 584 n.3; *Barnes v. Sullivan*, 932 F.2d 1356, 1358

(11th Cir. 1991). The district court must view the evidence as a whole,

taking into account evidence favorable as well as unfavorable to the

decision. *Foote*, 67 F.3d at 1560; *accord Lowery v. Sullivan*, 979 F.2d 835,

837 (11th Cir. 1992) (holding that the court must scrutinize the entire

record to determine reasonableness of factual findings); *Parker v. Bowen,*

793 F.2d 1177 (11th Cir. 1986) (finding that the court must also consider

evidence detracting from evidence on which the Commissioner relied).

However, the district court will reverse the Commissioner's decision on

plenary review if the decision applies incorrect law, or if the decision fails to

provide the district court with sufficient reasoning to determine that the

Commissioner properly applied the law. *Keeton v. Dep't Health & Human*

*Servs.*, 21 F.3d 1064, 1066 (11th Cir. 1994).

The law defines disability as the inability to do any substantial gainful

activity by reason of any medically determinable physical or mental

impairment that can be expected to result in death, or has lasted or can be

expected to last for a continuous period of not less than twelve months. 42

U.S.C. §§ 416(I), 423(d)(1) (2012); 20 C.F.R. § 416.905 (2015).[1] The

impairment must be severe, making Plaintiff unable to do her previous

work, or any other substantial gainful activity which exists in the national

economy. § 423(d)(2); 20 C.F.R. §§ 416.905–416.911.

The ALJ must follow five steps in evaluating a claim of disability. 20

C.F.R. § 416.920. The claimant has the burden of proving the existence of

a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936

F.2d 1215, 1218 (11th Cir. 1991). First, if a claimant is working at a

substantial gainful activity, she is not disabled. § 416.920(b). Second, if a

claimant does not have any impairment or combination of impairments

which significantly limit her physical or mental ability to do basic work

activities, then she does not have a severe impairment and is not disabled.

§ 416.920(c). Third, if a claimant's impairments meet or equal an

impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is

disabled. § 416.920(d). Fourth, if a claimant's impairments do not prevent

her from doing past relevant work, she is not disabled. §§ 416.920(e)–(f).

Fifth, if a claimant's impairments (considering her residual functional

---

[1] All further references to 20 C.F.R. will be to the 2015 version, unless otherwise specified.

capacity ("RFC"), age, education, and past work) prevent her from doing other work that exists in the national economy, then she is disabled. § 416.920(g).

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff. *Walker v. Bowen*, 826 F.2d 996, 1002 (11th Cir. 1987); *see also Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2.[2] The Commissioner may satisfy this burden by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled. *Walker*, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to

---

[2] In *Doughty* the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.

*Id.* (internal citations omitted).

show that the claimant can perform other work.").

## III.  SUMMARY OF THE RECORD

### A.    Medical Records

Plaintiff presented to the VA in November 2013 requesting alcohol detox following several weeks of excessive daily drinking. (R. 626–47.) Plaintiff's "active problems list" included COPD, vitamin D deficiency, tobacco use disorder, pain in joint involving shoulder region, migraines, low back pain, gastroesophageal reflux disease ("GERD"), and alcohol abuse. Plaintiff also reported smoking one to two packs of cigarettes per day and occasional marijuana use. At the time, however, Plaintiff had no headaches, chest pain, palpitations, trouble breathing on exertion, cough, shortness of breath, or wheezing. Plaintiff also ambulated well without assistance. Physical examination was normal. Plaintiff was assessed with alcohol and nicotine dependence and a GAF score of 35–45, and referred for substance abuse treatment. (R. 616–22, 639–40.)

In December 2013 Plaintiff returned to the VA with complaints of possible pneumonia and low back pain (R. 451–58.) He also reported that his migraines were no better on gabapentin and requested to see a specialist for headaches. He denied chest pain, shortness of breath, and

headaches. Physical examination was normal and he had normal sensory and motor skills in all extremities. A neurology consult was placed for migraines. X-rays later than month revealed COPD, but no acute pulmonary disease or significant changes. (R. 676–77.)

Plaintiff presented to the Cardiology Clinic at the VA for a new patient consultation in January 2014. (R. 431–35) He reporting having a history of left sided chest pain, but advised that he only had the pain several times a week when sitting and that the pain only lasted up to a few minutes. He also reported that the pain had gotten better since he stopped drinking. Plaintiff said he did a lot of walking and that he had no chest pain while walking. Physical examination was normal. A cardiac computed tomography angiogram ("CTA") revealed normal findings. (R. 672–74.)

Plaintiff also had a neurology consultation in January 2014 for his migraines. (R. 396–99.) He reported that Sumatriptan aborted his migraines if he was able to catch them early. Examination revealed normal motor strength, except in Plaintiff's right shoulder, and normal reflexes, muscle tone, posture, stance, stride, and turns.

In March 2014 Plaintiff began complaining of pain in the upper left leg, which was worse with walking, and occasional left hip and knee pain

(R. 355–58.) Cardiovascular, pulmonary, and neurological examinations were normal. Plaintiff had some tenderness in his left thigh but nonetheless had good range of motion, normal pulses, no edema, and no cyanosis in his left leg. There was no edema or erythema in his left knee or hip, his range of motion was intact, and his strength was equal bilaterally. An x-ray of Plaintiff's left hip revealed degenerative arthritis and irregular sclerosis involving the neck of the left femur, but no fracture or dislocation. (R. 669–70.) An x-ray of Plaintiff's left knee showed mild osteopenia, but normal joint spaces, no bone erosion, and no evidence of fracture or dislocation

Plaintiff returned to the VA later that month with complaints of left lower back pain and some pain in his left thigh (R. 341–48.) Plaintiff reported injuring his back in the 1980's and that he had recently been doing some volunteer work that involved bending over. He advised that baclofen helped "a little" with his pain. Plaintiff demonstrated an abnormal gait. He also had limited flexion and limited lateral bending. There was no motor atrophy, however, and Plaintiff had no numbness or pain. An MRI of his left hip was normal (R. 325–27, 342, 355, 665–66.) An x-ray of his lumbar spine, however, revealed prominent L5-S1 disc degenerative

changes but no compression fractures or subluxations (R. 668.) Plaintiff

was therefore referred for a physical therapy consultation. (R. 340.)

A colonoscopy in March 2014 revealed diverticulosis in the sigmoid

colon, but was otherwise incomplete because multiple diverticula, tortuous

sigmoid, and an inability to visualize lumen prevented further

advancement. (R. 777.) A subsequent CT colonography was incomplete in

the sigmoid colon due to poor gaseous distention from bowel wall

thickening related to chronic diverticulosis, but unremarkable in the

remainder of the bowel. (R. 338–39.)

In April 2014 Plaintiff met with a vocational rehabilitation counselor.

(R. 336.) Plaintiff advised that he was interested in educational

opportunities instead of employment opportunities. The counselor therefore

determined that Plaintiff was not "a good candidate for Vocational

Rehabilitation services as the Veteran doesn't wish to work at this time.

Veteran wishes to attend a training program." (*Id.*)

In June 2014 Plaintiff returned to the VA complaining of headaches

and sinus congestion (R. 713–17.) He had no problems breathing,

however, and no chest pain. Plaintiff also continued to smoke cigarettes.

Physical examination was largely normal. Subsequent chest x-ray showed

COPD, but no pulmonary infiltrates, masses, or pleural or mediastinal disease (R. 1072–73.)

During a biopsychosocial examination in July 2014 Plaintiff reported that he wanted to start drinking again after being sober for nine months. (R. 1235–39.) Plaintiff asked to be admitted to psychiatry services because otherwise he would go home and drink. The examination notes state that Plaintiff had been diagnosed with major depressive disorder and that he was currently being followed by psychology. Plaintiff was assessed with alcohol use disorder, as well as COPD, chronic pain, and GERD by history, and admitted to psychiatry services.

Plaintiff thereafter had several x-rays of his right shoulder. In October 2014 there was no fracture or dislocation in his right shoulder. (R. 1261.) In January 2015 there was no evidence of a rotator cuff tear and his shoulder, according to the x-ray, was normal other than some mild arthritis in the joint. (R. 1259.) In October 2015, Plaintiff's right shoulder x-ray was normal. (R. 1250.) Eventually, however, an MRI in March 2016 showed swelling and a possible surface tear in the supraspinatus tendon of Plaintiff's right shoulder. (R. 1244–45.)

Plaintiff also went for an MRI of his lumbar spine in February 2016. (R. 1241–42.) Although the MRI showed degenerative disc changes, there

was only mild displacement.

## B.    Opinion Evidence

Thomas Peele, M.D., a state agency physician, completed a physical residual functional capacity assessment for Plaintiff on July 18, 2014. (R. 74–76.) Dr. Peele opined that Plaintiff could occasionally lift and/or carry 20 pounds and frequently lift and/or carry 10 pounds. Plaintiff could stand and/or walk for a total of 6 hours in an 8-hour workday and sit for a total of 6 hours in an 8-hour workday. He had no other pushing or pulling limitations. Plaintiff could frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds. Plaintiff had to avoid concentrated exposure to extreme cold, heat, wetness, humidity, vibration, hazards, and fumes, odors, dusts, gases, and poor ventilation. He did not, however, have any manipulative, visual, or communicative limitations.

## C.    Hearing Testimony

At the hearing on March 15, 2016, Plaintiff was fifty-three years old. (R. 36.) Plaintiff only completed the seventh grade. (R. 36.) Although Plaintiff's sister recently paid for him to go to community college for a semester so he could try to get his GED, Plaintiff struggled. (R. 37.)

Instead of making his sister pay for additional semesters, Plaintiff talked to his social worker at the VA, who made a few phone calls. Several weeks later Plaintiff received his GED in the mail.

Plaintiff had been sober for approximately two-and-a-half years. (R. 42.) He now goes to Alcoholics Anonymous ("AA") meetings every day of the week but has a hard time because his mind wanders. (R. 41–42.) Plaintiff still smokes approximately ten to twelve cigarettes per day. (R. 42.) He has three different inhalers for his breathing problems. (R. 43.)

Plaintiff worst problem, however, is his right shoulder, which he injured in 2010. At first he could not even dress himself. A little over a year ago he made it worse doing some work and had to get a cortisone shot. (R. 44.) At the hearing, however, he was able to lift his right arm slightly above shoulder level. He can reach forward without severe pain.

Plaintiff does his own house work, including sweeping and mopping. Although he cannot lift very much, he can carry a 20-pound bag of mulch for a short distance. (R. 45.) He has problems with standing and walking, which requires him to either take a bus and ride his bicycle to his AA meetings. He has to lift his bicycle and put it on the front of the bus. He usually stops at the Taco Bell by his house during his bike ride for five to

ten minutes because his hips hurt and he cannot breathe. (R. 46.)

Sometimes he also smokes a cigarette on that break.

In the mornings he plays cards with guys that pass his apartment. (R.

47.) He also goes around and collects scrap metal during the day.

Sometimes he goes a couple of weeks without a migraine, but other

times he has to take his migraine medicine two or three times a day. (R.

48.) If he takes his medication soon enough after the migraine begins the

medication only takes about 20 to 25 minutes to work. If he gets a migraine

while he is at an AA meeting he takes his medicine and is able to stay for

the rest of the meeting. (R. 48–49.)

Donna Mancini, a vocational expert ("VE"), also testified at the

hearing. The ALJ asked the VE whether there would be any jobs

appropriate in the national economy for an individual with no past relevant

work, a seventh grade education, and the ability to perform at the light

exertional level but with no climbing of ropes, scaffolding, or ladders, no

exposure to concentrated temperature extremes, wet, or humid

environments, concentrated fumes, gases, poorly ventilated areas, no

exposure to concentrated vibrations or hazards, and no overhead reaching.

(R. 50–51.) The VE testified that such an individual could perform work as

a cashier II, ticket seller, or ticket taker. (R. 51.) The VE confirmed that if the individual was limited to routine tasks, he could still perform those positions.

The ALJ also asked whether there would be any jobs appropriate in the national economy for this same hypothetical individual if he or she also could not have any exposure to the public. (R. 52.) The VE testified that such an individual could perform work as a collator operator, routing clerk, or marker.

The VE further testified, however, that based on her experience working with employees and employers, if the individual needed to take five to ten-minute breaks per hour throughout the day to refocus, the individual could not stay in competitive labor. (R. 52–54.) Similarly, if the individual was absent from work once per week, the individual could not stay in competitive labor. (R. 53.) Absenteeism and breaks, however, are not covered in the Dictionary of Occupational Titles.

## D.   The ALJ's Findings

The ALJ determined that Plaintiff had not engaged in substantial gainful activity since February 27, 2014, the application date. (R. 23.) In terms of severe impairments, the ALJ found that Plaintiff has osteoarthrosis, COPD, and migraines. At step three, however, the ALJ did

not find that any of the impairments or combination of impairments met or

medically equaled the severity of one of the listed impairments.

At step four the ALJ found that Plaintiff has the residual functional

capacity ("RFC") to perform light work as defined in 20 C.F.R. §

416.967(b), with additional limitations. (R. 24.) The ALJ further determined

that Plaintiff has no past relevant work. (R. 27.)

At step five, however, based on Plaintiff's age, education, and RFC,

the ALJ found there are jobs that exist in significant numbers in the

national economy Plaintiff can perform. Accordingly, the ALJ determined

Plaintiff has not been under a disability since February 27, 2014—the date

the application was filed. (R. 28–29.)

## IV. DISCUSSION

Plaintiff's sole argument on appeal is that substantial evidence does

not support the ALJ's RFC determination. (ECF No. 15.)

A claimant's RFC is the most a claimant can do, despite his

limitations. 20 C.F.R. § 416.945(a)(1). The RFC is based, not only on

medical opinions, but also the ALJ's review of all relevant evidence in the

record. *Id.*; 20 C.F.R. § 416.946.

The ALJ determined that Plaintiff has the RFC to perform light work,

"except with no climbing of ladders, ropes, or scaffolds; no overhead

reaching; no exposure to concentrated temperature extremes, wetness or

humid environments, concentrated fumes, gases, poorly ventilated areas,

concentrated vibrations, or hazards; and he requires only simple routine

tasks with no exposure to the public." (R. 24.) Under SSR 83-10, "light

work" is defined as:

> lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted in a particular light job may be very little, a job is in this category when it requires a good deal of walking or standing--the primary difference between sedentary and most light jobs. A job is also in this category when it involves sitting most of the time but with some pushing and pulling of arm-hand or leg-foot controls, which require greater exertion than in sedentary work; e.g., mattress sewing machine operator, motor-grader operator, and road-roller operator (skilled and semiskilled jobs in these particular instances). Relatively few unskilled light jobs are performed in a seated position.

Additionally, SSR 83-10 defines "frequent" as:

> occurring from one-third to two-thirds of the time. Since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday. Sitting may occur intermittently during the remaining time. The lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping. Many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the

fingers for fine activities to the extent required in much sedentary work.

Substantial evidence supports the ALJ's determination that Plaintiff has the RFC to perform light work with additional limitations.

For starters, the ALJ thoroughly discussed substantial objective medical evidence that supported her RFC determination. *See Dyer v. Barnhart*, 395 F.3d 1206, 12111 (11th Cir. 2005) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision . . . is not a broad rejection which is 'not enough to enable the district court or this Court to conclude that the ALJ considered her medical condition as a whole."). For example, in November 2013 Plaintiff reported no physical complaints, ambulated well without assistance, and had a normal physical examination. Physical examination was again normal in December 2013, including normal sensory and motor skills in all extremities. Plaintiff again had a normal physical examination in January 2014, as well as normal motor strength in extremities except his right shoulder, and normal reflexes, muscle tone, posture, stance, stride, and turns. Plaintiff had normal cardiovascular, pulmonary, and neurological examinations in March 2014. Physical examination in June 2014 was also largely normal.

In December 2013, despite having COPD, Plaintiff denied chest pain and shortness of breath, and there was no evidence of acute pulmonary disease or significant changes. A January 2014 cardiac CTA revealed normal findings and Plaintiff admitted that he did a lot of walking without any chest pain. Then in June 2014 Plaintiff reported having no chest pain or problems breathing and, other than COPD, chest x-rays were normal. Nevertheless, the ALJ considered Plaintiff's COPD and limited him to no exposure to concentrated temperature extremes, wetness or humid environments, concentrated fumes, gases, and poorly ventilated areas.

Although Plaintiff had diminished strength in his right shoulder in January 2014, x-rays in October 2014, January 2015, and October 2015 were largely normal, other than some mild arthritis in the joint. There was no evidence of any other abnormality in his right shoulder until the MRI in March 2016 showed swelling and a *possible* surface tear in the supraspinatus tendon. Even so, the ALJ took Plaintiff's shoulder complaints into consideration in her RFC finding and limited Plaintiff to no overhead lifting or climbing.

Despite having degenerative arthritis and irregular sclerosis in his left leg and mild osteopenia in his left knee in March 2014, there were no

fractures or dislocations, no edema, and Plaintiff had good range of motion in his left leg. An MRI of Plaintiff's left hip was also normal, and while he had limited range of motion in his lumbar spine and degenerative changes in his lumbar spine, there was no evidence of compression fractures or subluxations. By February 2016 the degenerative disc changes in Plaintiff's lumbar spine had only caused mild displacement. Nevertheless, the ALJ limited Plaintiff to no climbing.

Finally, despite Plaintiff's migraine complaints, his neurology consultation revealed largely normal findings. Plaintiff admitted to the neurologist that his migraine medication effectively abort the migraines if he takes the medication soon enough after onset of the migraines. Notably, Plaintiff is able to remain at his AA meetings following the onset of a migraine as long as he takes his medication soon enough after onset.

As the ALJ noted, Plaintiff received minimal treatment for his physical complaints. Plaintiff never required extended inpatient hospitalization for a physical problem. Plaintiff's physicians never recommended surgery for any of his physical complaints and instead only recommended routine conservative treatment. The only examination at which Plaintiff ever demonstrated difficulty ambulating was in March 2014 and no providers

ever prescribed an assistive device for ambulating. In sum, the objective medical evidence suggests that Plaintiff is capable of performing light work with the additional limitations set forth in the RFC.

The ALJ also considered and accepted the state agency physician's opinion in determining Plaintiff's RFC, which is well-supported by the objective medical evidence. *See* 20 C.F.R. § 416.929(c)(1) (explaining that in evaluating the intensity and persistence of a claimant's symptoms, the Commissioner considers all of the available evidence, including the "medical opinions of your treating source and other medical opinions"). Notably, none of Plaintiff's physicians ever enumerated any physical work-related limitations.

The ALJ further discussed and relied upon Plaintiff's activities of daily living, which were largely inconsistent with Plaintiff's statements about the limiting effects of his symptoms. *See* § 416.929(c)(3) (a claimant's activities of daily living are relevant in evaluating his symptoms); SSR 16-3p, 2017 WL 5180304, at *7–8 (Oct. 25, 2017); *see also Hargress v. Soc. Sec. Admin., Comm'r*, 883 F.3d 1302, 1308 (11th Cir. 2018) (noting that SSR 16-3p became effective March 28, 2016). For example, Plaintiff testified that he can lift a 20-pound bag of mulch and carry the bag for a

short distance. He also puts his bicycle onto the bus rack, rides the bus to AA, and rides his bicycle home from AA. During the day Plaintiff goes metal scrapping around the neighborhood. He also does his own house work, including sweeping and mopping. These activities suggest that Plaintiff can lift and/or carry 20 pounds occasionally and 10 pounds frequently, as well as stand and/or walk for up to 6 hours in an 8-hour workday.

Finally, although Plaintiff argues that the ALJ should have applied the light Grid rule for a person of advanced aged, Plaintiff's argument is flawed for two reasons.

First, Plaintiff has failed to offer any reason why he should have been considered a person of advanced age—which requires a claimant to be age 55 or older. *See* 20 C.F.R. § 416.963(e). Plaintiff was 53 years old at the time of the ALJ's decision—which placed him within the "closely approaching advanced age" category. *See* § 416.963(d). An ALJ may use an older age category if a claimant is within a few days or months of reaching the older age category. *See* § 416.963(b). In borderline situations, the Commissioner "will consider whether to use the older age category after evaluating the overall impact of all the factors in [the claimant's]

case." *Id.*

Plaintiff, however, was not merely within a few days or months of reaching age 55. Instead, Plaintiff was more than a year and a half away from reaching the advanced age category. Simply because Plaintiff was within a little over a year and a half of the advanced age category does not mean he should have been placed in the advanced age category. *See Crady v. Sec'y of Health & Human Servs.*, 835 F.2d 617, 622 (6th Cir. 1987) ("The fact that age categories are not to be applied mechanically, however, obviously does not mean that a claimant must move mechanically to the next age category whenever his chronological age is close to that category."). Plaintiff also offers no reason why his case is a borderline situation to warrant placement in the advanced age category. As the Commissioner points out, the VE's identification of a significant number of jobs that Plaintiff could perform mitigates against placing Plaintiff into the older age category.

Second, the ALJ did not rely on the Grids in her decision, nor was she required to.

> The general rule is that after determining the claimant's RFC and ability or inability to return to past relevant work, the ALJ may use the grids to determine whether other jobs exist in the national economy that a claimant is able to perform. However,

> "exclusive reliance on the grids is not appropriate either when the claimant is unable to perform a full range of work at a given residual functional level or when a claimant has non-exertional impairments that significantly limit basic work skills."

*Phillips v. Barnhart*, 357 F.3d 1232, 1242 (11th Cir. 2004) (citations omitted). Here, however, the ALJ determined that Plaintiff could not perform the full range of light work given his climbing and reaching exertional limitations, as well as his nonexertional limitations. The ALJ therefore did not apply the Grids and instead properly consulted the VE, who confirmed that an individual with no past relevant work, a seventh grade education, and all of limitations set forth in Plaintiff's RFC could perform work as a collator operator, routing clerk, or marker, all of which exist in significant numbers in the national economy.[3] The VE's testimony constituted substantial evidence supporting the ALJ's decision.[4]

Substantial evidence supports the ALJ's RFC determination. The ALJ's decision should therefore be affirmed.

---

[3] Even assuming the ALJ had consulted the Grids, rule 202.10—which applies to claimants, like Plaintiff, who have a limited or less than high school education but are at least literate and able to communicate in English, unskilled or no work skills, an RFC for light work, and are closely approaching advanced age—directs a finding of "not disabled." *See* 20 C.F.R. pt. 404, subpt. P, app. 2, § 202.01.

[4] Plaintiff does not challenge the ALJ's hypothetical to the VE and has therefore waived any argument with respect to the hypothetical.

## V.  RECOMMENDATION

In light of the foregoing it is **RECOMMENDED** that the decision of the

Commissioner should be **AFFIRMED**.

**IN CHAMBERS** this 17th day of April 2018.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u> A copy of objections shall be served upon all other parties. If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**